**Michigan Supreme Court**
**Lansing, Michigan**

# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v ARNOLD

Docket No. 154764. Argued January 10, 2018 (Calendar No. 2). Decided July 19, 2018.

Lonnie J. Arnold was charged with aggravated indecent exposure, MCL 750.335a(2)(b), indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c), and being a fourth-offense habitual offender, MCL 769.12. He was convicted of both indecent-exposure counts after a jury trial in the Monroe Circuit Court. The court, Michael A. Weipert, J., sentenced defendant to 25 to 70 years' imprisonment for indecent exposure by a sexually delinquent person, to be served concurrently with a 2-to-15-year sentence for aggravated indecent exposure. Defendant appealed, arguing that the court was required to sentence him to one day to life in prison under MCL 750.335a(2)(c). The Court of Appeals, GLEICHER, P.J., and CAVANAGH and FORT HOOD, JJ., initially held in an unpublished per curiam opinion, issued April 12, 2016 (Docket No. 325407), that, under *People v Buehler (On Remand)*, 271 Mich App 653 (2006) (*Buehler II*), rev'd 477 Mich 18 (2007) (*Buehler III*), the sentencing guidelines, rather than MCL 750.335a(2)(c), controlled sentences for defendants convicted of indecent exposure by a sexually delinquent person, but because *People v Lockridge*, 498 Mich 358 (2015), had rendered the sentencing guidelines advisory in the time since defendant had been sentenced, the panel remanded the case to the sentencing court to determine whether it would have adhered to the guidelines had it known they were only advisory. Defendant moved for reconsideration, arguing that the Court of Appeals had erred by relying on *Buehler II*. While the motion was pending, the Court of Appeals decided *People v Campbell*, 316 Mich App 279 (2016), which held that defendants convicted of indecent exposure by a sexually delinquent person must be sentenced to one day to life in prison. Consequently, the panel granted defendant's motion for reconsideration, vacated its previous opinion, and, in an unpublished per curiam opinion issued September 22, 2016, held that, under *Campbell*, defendant must be sentenced to one day to life in prison. The Supreme Court granted the prosecutor's application for leave to appeal. 500 Mich 964 (2017).

In a unanimous opinion by Justice CLEMENT, the Supreme Court *held*:

MCL 750.335a(2)(c) does not require an individual convicted of being a sexually delinquent person to be given a sentence of one day to life in prison. The one-day-to-life scheme was correctly construed in *People v Kelly*, 186 Mich App 524 (1990), as an option that a trial court may consider imposing alongside the other statutory penalties available under the statute. The decisions to the contrary in *Campbell* and in *People v Butler*, 465 Mich 940 (2001), were

overruled. The changes from "may be" and "shall" to "is" that 2005 PA 300 made to 1952 PA 73 were merely stylistic. The reasoning in *Buehler III*, which misconstrued the nature of the one-day-to-life sentencing option provided by MCL 750.335a and MCL 767.61a and inaccurately indicated that the 2005 PA 300 amendment of MCL 750.335a might have been meaningful, was disavowed. The Court of Appeals judgment was vacated, and the case was remanded to the Court of Appeals for reconsideration.

1. Criminal defendants charged with committing certain sex crimes can also be charged with having been a "sexually delinquent person" at the time of the offense. The sexually delinquent person scheme dates back to a series of statutes adopted in 1952, which were a further development of a scheme from the mid-1930s that allowed "sexual psychopaths" to be committed indefinitely to a state mental institution until their condition no longer presented a threat to public safety. The legislative history of these schemes indicated that sexual delinquency was considered a mental illness that precluded a fixed sentence and required a more flexible and less determinate sentencing framework.

2. The predicate offense for sexual-delinquency status with which defendant was charged was indecent exposure. Under MCL 750.335a(2)(a) and (b), indecent exposure is a misdemeanor punishable by not more than one year in prison, or not more than two years if aggravated circumstances are present, but when committed by a sexually delinquent person, MCL 750.335a(2)(c) provides that the offense is punishable for an indeterminate term, the minimum of which is one day and the maximum of which is life. MCL 767.61a sets forth the procedure by which an individual accused of one of the predicate offenses can also be accused of being a sexually delinquent person, stating that in any prosecution for an offense committed by a sexually delinquent person for which may be imposed an alternate sentence to imprisonment for an indeterminate term, the minimum of which is one day and the maximum of which is life, the indictment shall charge the offense and may also charge that the defendant was, at the time said offense was committed, a sexually delinquent person. MCL 767.61a further provides that upon a verdict of guilty to the first charge or to both charges or upon a plea of guilty to the first charge or to both charges, the court may impose any punishment provided by law for such offense.

3. *Kelly* correctly construed the one-day-to-life sentence set forth in MCL 750.335a(2)(c) as not mandatory but rather an optional alternative. MCL 767.61a characterizes the one-day-to-life sentence as an alternate sentence. The dictionary indicates that the adjective "alternate" is related to "alternative," which may be used to refer to a variant or substitute in cases where no choice is involved, but that this usage also coexists with the notion of "alternate" as "optional." In 1952 PA 73, the Legislature provided that indecent exposure was "punishable by imprisonment in the county jail for not more than 1 year" and, if committed by a sexually delinquent person, "may be punishable by imprisonment in the state prison for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life." The word "punishable" expresses only the potential for punishment, not its necessity, meaning that either up to a year in jail or a one-day-to-life sentence were possibilities. Further, the statute stated that, when dealing with a sexually delinquent person, the offense "may be" punishable by a one-day-to-life sentence, and "may" is ordinarily permissive. Moreover, the Legislature is capable of adopting nondiscretionary sentences and has done so for other crimes. Construing the "alternate sentence" for sexually delinquent persons as entirely optional was also more consistent with the

broader law of sentencing in Michigan when the sexual-delinquency scheme was adopted, at which time, before the statutory sentencing guidelines' enactment, a judge faced with an adjudicated sexual delinquent guilty of indecent exposure could choose any legally available sentencing option the judge deemed appropriate. Construing the one-day-to-life option as an alternative that the trial court was free to consider alongside an ordinary criminal sentence of up to one year in jail was also supported by the history of the sexual-delinquency scheme. In light of these considerations, *Kelly* correctly construed the one-day-to-life alternate sentence as an option a sentencing judge could draw upon, alongside and not to the exclusion of other available options. The statement in *Butler* that there was no alternative to the mandatory indeterminate sentence of one day to life in prison when the trial court chooses to incarcerate a person convicted under MCL 750.335a and MCL 750.10a was incorrect. One day to life was not a mandatory sentence even when the trial court chose to incarcerate the defendant, nor has any aspect of the legislative sentencing guidelines purported to make the one-day-to-life sentence mandatory.

4. *Kelly* correctly held that the sentence of one day to life was not modifiable. While 1952 PA 73 stated that indecent exposure by a sexually delinquent person may be punishable by a special indeterminate sentence, it also stated that if such a sentence was imposed, the minimum of the term shall be one day and the maximum of the term shall be life. The use of the word "shall" suggests that a trial court had no discretion to further modify the terms of the sentence, because if it chose to avail itself of the special indeterminate sentence, it had to sentence according to the special sentence's terms. Moreover, MCL 767.61a characterizes "one day to life" as an "alternate" sentence, which indicates that it ought to function in some distinct way from a term-of-years sentence. The history of the enactment of the sexual-delinquency scheme further supports this conclusion. While 1952 PA 72 has since been repealed, it was adopted contemporaneously with the sexual-delinquency scheme, and it directed the Department of Corrections on how to process persons paroled from a sentence of from one day to life. There were no instructions for how to process persons paroled from a sentence of, for example, two days to life. Construing "one day to life" as being nonmodifiable was also consistent with the history of the sexual-delinquency scheme, the purpose of which was to create a different sentencing option in which the judge gave up control over the amount of time the defendant served to experts who would assess when the defendant was well enough to rejoin society.

5. *Kelly* correctly held that the one-day-to-life sentencing scheme was an exception to the provision in MCL 769.9(2) that prohibits a court from imposing a sentence in which the maximum penalty is life imprisonment with a minimum for a term of years included in the same sentence, otherwise known as the ban on "life tails." MCL 769.9(2) applies only to "cases where the maximum sentence in the discretion of the court may be imprisonment for life or any number or term of years." The phrasing "life or any term of years" is used verbatim in a variety of criminal statutes. When MCL 750.335a was adopted, it spoke of "imprisonment in the state prison for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life," and MCL 767.61a speaks of "an indeterminate term, the minimum of which is 1 day and the maximum of which is life." This difference in wording suggested that sexual-delinquency cases should be removed from MCL 769.9(2). Moreover, because MCL 769.9(2) is a general indeterminate sentencing statute while the sexual-delinquency scheme is a specific, integrated scheme, the more specific statute controls. Therefore, the one-day-to-life sentence the

Legislature adopted in 1952 was an alternative sentencing option that existed alongside other options, such as a life sentence or a term of years.

6. The decision in *Buehler III* was based on a flawed initial premise about the sexual-delinquency scheme, and it did not appreciate the nature of the one-day-to-life sentence and the tension between it and the sentencing guidelines. The remand order in *Buehler* directed the Court of Appeals to compare the guidelines against "the indeterminate sentence prescribed by MCL 750.335a." But MCL 750.335a did not prescribe anything; instead, it only made an option available. *Buehler* also presumed that the trial court's deviation from the sentencing guidelines should have been the end of that case's analysis. But at least until the adoption of the sentencing guidelines, no sentence on the Class A sentencing grid would even have been legal for a judge to impose on a sexually delinquent person guilty of indecent exposure. *Buehler III* did not consider whether the adoption of the legislative sentencing guidelines could make legal a sentence which would not otherwise have been legal before the guidelines were adopted. Accordingly, *Buehler III* was not a binding statement of the proper interpretation of these statutes.

7. *Campbell* was incorrectly decided. In *Campbell*, the Court of Appeals held that the conflict between the statutory language provided under MCL 750.335a(2)(c) and the sentencing guidelines, MCL 769.34, must be resolved in favor of applying MCL 750.335a(2)(c) in light of the fact that the sentencing guidelines were rendered advisory by *People v Lockridge*, 498 Mich 358 (2015), whereas the sentence provided under MCL 750.335a(2)(c) was stated in mandatory terms. First, MCL 750.335a(2)(c) is not "stated in mandatory terms." When adopted, it said that a sexually delinquent person who committed indecent exposure "may be punishable . . . for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life." After 2005 PA 300, it now says that indecent exposure by a sexually delinquent person "is punishable . . . for an indeterminate term, the minimum of which is 1 day and the maximum of which is life." This change in wording had no effect on the meaning of the statute and was merely stylistic. Further, MCL 750.335a(2)(c) still says only that the offense is punishable by a one-day-to-life sentence, and "punishable" expresses only the possibility of punishment, not its necessity. Moreover, MCL 767.61a has not been amended, meaning that it still characterizes one day to life as an alternate sentence, not a mandatory sentence. And MCL 767.61a lays out a procedure common to all five sexual-delinquency crimes, yet each of the other four still uses the former "may be punishable" and "shall be 1 day . . . shall be life" wording. Because the sexual-delinquency alternative sentence is intended to work the same for all five offenses, if it is optional for the others, it must still be optional for indecent exposure. Second, *Campbell* ascribed inappropriate significance to *Lockridge*, which concluded that the scoring process for the legislative sentencing guidelines violated the Sixth Amendment and, as a remedy for that constitutional violation, directed that henceforth the guidelines would be only advisory. Neither identifying that problem nor crafting that remedy illuminated whether the adoption of the sentencing guidelines and the classification of indecent exposure by a sexually delinquent person as a Class A felony could make legal a sentence which would not have been legal before the adoption of the sentencing guidelines. Third, the Court of Appeals relied on the series of decisions in *Buehler*, which misconstrued the nature of the one-day-to-life sentencing option provided by MCL 750.335a and MCL 767.61a and inaccurately indicated that the 2005 PA 300 amendment to MCL 750.335a might have been meaningful. For these reasons, *Campbell* was set aside.

8. Given the significance of this decision, which embraced *Kelly*, overruled *Butler*, and disavowed *Buehler*, the case was remanded to the Court of Appeals for reconsideration in light of the revised state of the law. On remand, the Court of Appeals was directed to resolve what effect the adoption of the legislative sentencing guidelines had on the operation of the sexual-delinquency scheme as it was construed before the adoption of the guidelines.

Court of Appeals judgment vacated; case remanded to the Court of Appeals.

©2018 State of Michigan

# OPINION

Chief Justice:          Justices:
Stephen J. Markman      Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein
                        Kurtis T. Wilder
                        Elizabeth T. Clement

FILED July 19, 2018

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                No. 154764

LONNIE JAMES ARNOLD,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CLEMENT, J.

In this case we determine whether individuals convicted of being "sexually delinquent persons" must be given a "1 day to life" prison sentence in accordance with MCL 750.335a(2)(c). We conclude that a "1 day to life" sentence has never been required by the statutory scheme, overruling the Court of Appeals' contrary conclusion in *People v Campbell*, 316 Mich App 279; 894 NW2d 72 (2016), and remand this case to the Court of Appeals for reconsideration in light of our conclusion.

# I. FACTS AND PROCEDURAL HISTORY

Defendant Lonnie Arnold masturbated in front of an employee at the Monroe Public Library in January 2014. He was charged with aggravated indecent exposure, MCL 750.335a(2)(b), indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c), and also with being a fourth-offense habitual offender, MCL 769.12. He was convicted after a jury trial on both substantive indecent-exposure counts.

At sentencing, the Department of Corrections (DOC) recommended[1] that defendant serve 225 months to 40 years in prison on the count of indecent exposure by a sexually delinquent person, to be served concurrently with 2 to 15 years on the aggravated indecent-exposure count.[2] At sentencing, defense counsel, Steven Hyder, asked that defendant be given "1 day to life":

> The law still says that a minimum term of sentence one day to life is what the sentence should be. . . . [T]his Court can sentence him to one day on any conviction, one day to life imprisonment. I don't believe that you have to follow the guidelines for the habitual offender and follow them in sentencing him to 225 months, is what the recommendation is, Judge.

The trial judge, however, rejected this request, concluding that it was not legal:

> *The Court*: I will tell you this, Mr. Hyder, if I did that one day to life, DOC would write to me and say I cannot sentence him to life. They would say you have to set a maximum because I've had that happen on other cases already.

---

[1] Before sentencing, the DOC is required to prepare a presentence investigation report that includes "[a] specific written recommendation for disposition" and a "recommended sentence." MCL 771.14(1), (2)(c), and (2)(e)(*v*).

[2] While the maximum sentence for aggravated indecent exposure is ordinarily 2 years, MCL 750.335a(2)(b), defendant's status as a fourth-offense habitual offender increased the maximum to 15 years, MCL 769.12(1)(c).

*Mr. Hyder*: Apparently, there's conflict between [the DOC] then and the statute because I'm sure this Court will review the statute in depth, and I'm sure the Court has saw what the sentence is on—on the law scope. I'm relying upon the—

*The Court*: Well, I'll just tell you this. I have to give him a tail. I can't just say life because DOC will write to me and say you can't do that. There's a statute on it that says that. Okay.

The trial court sentenced defendant to 25 to 70 years' imprisonment on the controlling count, to be served concurrently with a 2-to-15-year sentence for aggravated indecent exposure.[3]

In the Court of Appeals, defendant argued that he had to be sentenced to "1 day to life" rather than under the sentencing guidelines. In an unpublished opinion, the panel concluded that the sentencing guidelines still controlled sentences for defendants convicted of indecent exposure by a sexually delinquent person, relying on *People v Buehler (On Remand)*, 271 Mich App 653; 723 NW2d 578 (2006) (*Buehler II*).[4] That said, during the pendency of defendant's appellate proceedings this Court had decided *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), making the sentencing guidelines advisory. The panel therefore remanded to the trial court to determine whether it would have adhered to the guidelines had it known they were only advisory.

_____

[3] The Court of Appeals ultimately set aside defendant's sentence for aggravated indecent exposure for reasons unrelated to the questions presented in this appeal, relying on *People v Franklin*, 298 Mich App 539; 828 NW2d 61 (2012). *People v Arnold*, unpublished per curiam opinion of the Court of Appeals, issued April 12, 2016 (Docket No. 325407), p 4, vacated in part by order entered September 26, 2016.

[4] *Arnold*, unpub op at 5. This part of the opinion was later vacated.

Defendant moved for reconsideration, arguing that the Court of Appeals erred by relying on *Buehler II*. In the meantime, the Court issued its opinion in *People v Campbell*, 316 Mich App 279; 894 NW2d 72 (2016), in which it held that defendants convicted of indecent exposure by a sexually delinquent person must be sentenced to "1 day to life" under MCL 750.335a(2)(c). *Id.* at 300. Consequently, the panel in the instant case granted reconsideration and, in an unpublished opinion, held that defendant, like the defendant in *Campbell*, must be sentenced to "1 day to life." *People v Arnold (On Reconsideration)*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2016 (Docket No. 325407), p 2. We then granted leave to appeal. *People v Arnold*, 500 Mich 964 (2017).

## II. STANDARD OF REVIEW

Questions of statutory interpretation are subject to de novo review. *People v Babcock*, 469 Mich 247, 253; 666 NW2d 231 (2003).

## III. LEGAL BACKGROUND

## A. SEXUAL DELINQUENCY IN MICHIGAN

Criminal defendants charged with committing certain sex crimes also can be charged with having been a "sexually delinquent person" at the time of the offense. In *People v Winford*, 404 Mich 400, 405-406; 273 NW2d 54 (1978), we discussed the basic contours of the sexually-delinquent-person scheme:

> The history of sexual delinquency legislation clearly indicates the Legislature's intent to create a comprehensive, unified statutory scheme. This legislation was enacted to provide an alternate sentence for certain specific sexual offenses where evidence appeared to justify a more flexible form of incarceration. . . .

4

To this end, the Legislature introduced language into several previously existing categories of sexual offenses to allow prosecution for sexual delinquency. . . .

To help implement these statutory changes, the Legislature also separately enacted a definitional provision and a procedural provision as general guidelines in sexual delinquency prosecutions.

*Winford* thus laid out three main components of the sexually-delinquent-person scheme: (1) predicate offenses that are eligible for "a more flexible form of incarceration" when committed by a sexually delinquent person, (2) a definition of "sexually delinquent persons,"[5] and (3) a "procedural provision" containing charging instructions.

The predicate offense for sexual delinquency status with which defendant in the instant case was charged is indecent exposure. The governing statute provides:

(1) A person shall not knowingly make any open or indecent exposure of his or her person or of the person of another.

(2) A person who violates subsection (1) is guilty of a crime, as follows:

(a) Except as provided in subsection (b) or (c), the person is guilty of a misdemeanor punishable by imprisonment for not more than 1 year, or a fine of not more than $1,000.00, or both.

(b) If the person was fondling his or her genitals, pubic area, [or] buttocks . . . while violating subsection (1), the person is guilty of a misdemeanor punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

---

[5] While not ultimately pertinent to the outcome of this case, a "sexually delinquent person" is defined as "any person whose sexual behavior is characterized by repetitive or compulsive acts which indicate a disregard of consequences or the recognized rights of others, or by the use of force upon another person in attempting sex relations of either a heterosexual or homosexual nature, or by the commission of sexual aggressions against children under the age of 16." MCL 750.10a.

5

(c) If the person was at the time of the violation a sexually delinquent person, the violation is punishable by imprisonment for an indeterminate term, the minimum of which is 1 day and the maximum of which is life. [MCL 750.335a.]

Thus, indecent exposure is a one-year misdemeanor, with aggravated circumstances making it a two-year "misdemeanor,"[6] but when committed by a "sexually delinquent person," the offense "is punishable by imprisonment for an indeterminate term, the minimum of which is 1 day and the maximum of which is life." The "procedural provision," MCL 767.61a, sets out how an individual accused of one of the predicate offenses can also be accused of being a sexually delinquent person:

In any prosecution for an offense committed by a sexually delinquent person for which may be imposed an alternate sentence to imprisonment for an indeterminate term, the minimum of which is 1 day and the maximum of which is life, the indictment shall charge the offense and may also charge that the defendant was, at the time said offense was committed, a sexually delinquent person. . . . Upon a verdict of guilty to the first charge or to both charges or upon a plea of guilty to the first charge or to both charges the court may impose any punishment provided by law for such offense.

Defendant's sentencing illustrates the interpretive challenges posed by these statutes. Defendant did not challenge the presentence investigation report prepared by the DOC. The sentencing guidelines list indecent exposure by a sexually delinquent person as a Class A felony, MCL 777.16q, and the proposed scoring of defendant's guidelines variables placed him in cell F-III of the Class A grid, which provides for a minimum sentence of 135 to 225 months, MCL 777.62, the high end of which was then

___

[6] "Misdemeanors" with two-year maximum sentences present recurring interpretive challenges. See, e.g., *People v Smith*, 423 Mich 427; 378 NW2d 384 (1985); *People v Washington*, ___ Mich ___; ___ NW2d ___ (2018) (Docket No. 156283).

6

doubled to 450 months because defendant was a fourth-offense habitual offender, MCL 777.21(3)(c). Given the prospect of being forced to spend at least 11.25 years in prison before being eligible for parole, MCL 791.234(1), defendant understandably preferred the prospect of a sentence with a one-day minimum. The trial court, however, concluded that it could not give him a "life tail," arguing that the DOC would not accept such a sentence. In so stating, the court was apparently referring to MCL 769.9(2), which provides:

> In all cases where the maximum sentence in the discretion of the court may be imprisonment for life or any number or term of years, the court may impose a sentence for life or may impose a sentence for any term of years. If the sentence imposed by the court is for any term of years, the court shall fix both the minimum and the maximum of that sentence in terms of years or fraction thereof, and sentences so imposed shall be considered indeterminate sentences. *The court shall not impose a sentence in which the maximum penalty is life imprisonment with a minimum for a term of years included in the same sentence.* [Emphasis added.]

Consequently, the trial court imposed a sentence under the guidelines, with defendant's 25-year minimum being within the 135- to 450-month guidelines range.

Yet the trial court did not acknowledge that, in *People v Kelly*, 186 Mich App 524; 465 NW2d 569 (1990), the Court of Appeals had already addressed the relationship between a "1 day to life" sentence for sexual delinquents and MCL 769.9(2). In that case, the Court of Appeals "view[ed] the sexually delinquent sentencing scheme as a specific scheme which controls over the general indeterminate sentence act," making it "an exception to the indeterminate sentence provision . . . ." *Id*. at 531. A "1 day to life" sentence thus was said not to violate MCL 769.9(2). *Kelly* further held that the "1 day to life" option was not subject to modification. In *Kelly*, the defendant was sentenced to life imprisonment, and the Court vacated his sentence and remanded for resentencing. It said

7

that the defendant could be resentenced only "to imprisonment in the county jail for not more than one year, to a fine of not more than $500,[7] or to an indeterminate prison term of from one day to life." *Id.*

There have been two pertinent statutory changes since *Kelly* was decided. First, the legislative sentencing guidelines were enacted by 1998 PA 317. The sentencing guidelines treat sexual delinquency in a very different fashion from that expressed in *Kelly*. *Kelly* held, regarding incarceration, that the trial court had only the option of up to one year (now up to two years), or a sentence of "1 day to life"; by contrast, the guidelines purport[8] to *require* that defendant be given a minimum sentence of *at least* 135 months. And, as this opinion will discuss further, while this Court has indicated that indecent exposure by a sexually delinquent person is governed by the sentencing guidelines, see *People v Buehler* (*Buehler III*), 477 Mich 18, 24 n 18; 727 NW2d 127 (2007), we have yet to consider the tension between *Kelly*'s interpretation of the sexual delinquency scheme and the guidelines' treatment of that scheme. Second, 2005 PA 300 adjusted the "1 day to life" language in MCL 750.335a, changing it from "*may be punishable by imprisonment in the state prison for an indeterminate term, the minimum*

---

[7] When *Kelly* was decided, MCL 750.335a had not been amended either to include the two-year enhanced sentence for aggravated indecent exposure or to increase the fine to a maximum of $2,000. See 1952 PA 73; 2005 PA 300.

[8] We say "purport" to require because, while MCL 769.34(2) says that "the minimum sentence imposed by a court of this state . . . shall be within the appropriate sentence range under the . . . sentencing guidelines," we held in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), that the Sixth Amendment requires the guidelines to be advisory and not mandatory.

of which *shall be* 1 day and the maximum of which *shall be life*," 1952 PA 73, to "*is* punishable by imprisonment for an indeterminate term, the minimum of which *is* 1 day and the maximum of which *is* life."

The fundamental question presented by this case is how to construe the sentence of "1 day to life" provided for in MCL 750.335a and MCL 767.61a. The prosecutor effectively argues that "1 day to life" means "life or any term of years," such that a sentencing court may impose any sentence, including the one imposed here. The prosecutor's argument is based largely on the fact that the sentencing guidelines list this offense as a Class A felony. Defendant, by contrast, argues that "1 day to life" is an unmodifiable sentence to which he must be sentenced. Because of the sentencing guidelines' role in this debate, to resolve this case two determinations must be made. First, we must determine the proper interpretation of the sexual-delinquency scheme before the sentencing guidelines were adopted, which includes reviewing whether *Kelly* was rightly decided. Then, our having construed the sexual-delinquency scheme *before* the sentencing guidelines were adopted, the effect the adoption of the sentencing guidelines had on the sexual-delinquency scheme must be determined, along with an evaluation of the effect of 2005 PA 300 on the scheme.

To make sense of the "1 day to life" sentence, we must understand the characterization of it in MCL 767.61a as an "alternate sentence." As will be discussed at greater length, this word choice is open to multiple readings. As a result, and particularly in light of *Winford*'s observation that the history of the sexually-delinquent-person

9

scheme helpfully illuminates its meaning,[9] we turn to examining the history of how sexual delinquency came to be a part of Michigan law.

## B. THE HISTORY OF SEXUAL DELINQUENCY IN MICHIGAN

The sexually-delinquent-person scheme dates back to a series of statutes adopted in 1952. We offered a wide-ranging discussion of the context of its adoption in *People v Helzer*, 404 Mich 410, 420-421; 273 NW2d 44 (1978), overruled on other grounds by *People v Breidenbach*, 489 Mich 1; 798 NW2d 738 (2011):

> A close examination of the legislative history of sexual delinquency demonstrates a sound basis for an alternate sentencing interpretation. At the time the concept became part of Michigan law, related statutory provisions were enacted which clearly indicate sexual delinquency was conceived as possible mental illness precluding a fixed sentence. The concept of sexual delinquency was included in the then-existing mental health code and Department of Corrections Act, which specifically provided for treatment and early release upon satisfactory review by the parole board. The intended result entailed a more flexible and less determinate sentencing framework than set terms of imprisonment. This flexible form of incarceration was meant to entirely replace the more structured and limited sentence provided upon conviction of the principal charge.
>
> . . . In sum, sexual delinquency was part of a much broader scheme of rehabilitation involving a sentence adjusted to defendant's treatment and recovery from possible mental illness. Thus the sentence for being sexually delinquent was not primarily penal. Punishment within a specific limited period for the principal offense was reserved for those whose psychiatric histories, considered after conviction on the principal charge, reflected no serious tendency toward pathologically repetitive, compulsive, forceful or

---

[9] While we generally do not rely on legislative history, see *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), in this case it provides useful historical information that does not bear directly on the meaning of the statutory text.

10

aggressive acts.  So conceived, the sexually delinquent person concept was clearly intended to entail a more flexible, alternate form of sentencing.

But "[i]n construing a statute it is important to consider the law as it existed prior to the enactment, and particularly the mischief sought to be remedied by legislation." *Mich Dairy Co v Runnels*, 96 Mich 109, 111; 55 NW 617 (1893).  The 1952 "sexually delinquent person" scheme was a response to even older "sexual psychopath" legislation, known as the "Goodrich Act," enacted in the 1930s.

"During the late 1930s, American criminal law began to address the sexual psychopath statutorily."  Denno, *Life Before the Modern Sex Offender Statutes*, 92 Nw U L Rev 1317, 1344 (1998).  See also Anno: *Statutes relating to sexual psychopaths*, 24 ALR2d 350, 351, § 1 (stating, in 1952, that "[s]tatutes of the type under consideration are a recent development in the law—a development occurring mainly during the last two decades").  The general intent was to "provide civil commitment, segregation, and treatment of the sexual psychopath rather than criminal punishment." *Id*.  Michigan went through several rounds of implementing such a system, each of which was responsive to perceived defects in the predecessor, before arriving at our present scheme.

### 1. THE FIRST GOODRICH ACT

On Thursday, September 20, 1934, an 11-year-old seventh-grader in Detroit disappeared. *Girl, 11, Kidnaped, Police Fear After 2-Day Hunt Fails*, Detroit Free Press (September 22, 1934), p 1.  Her "violated body" was found in a trunk in the apartment of a Merton Goodrich. *Nationwide Hunt Starts for Maniac Killer Who Lured Gallaher Girl to Her Death; Suspect Freed by Ohio's Legal Bungling*, Detroit Free Press (September 27, 1934), p 1.  Goodrich had been "[t]wice committed to the Ohio State Hospital for the

Criminal Insane at Lima for attacks on girls . . . ." *Id.* In response, the Michigan Legislature adopted the "Goodrich Act," 1935 PA 88, which "was the first [sexual psychopath law] to be enacted" in the country. *Sex Offender Statutes*, 92 Nw U L Rev at 1351 n 171.[10] A legislative committee described its genesis as follows:

> The original Goodrich Act was passed, like most such legislation, in direct reaction to a particularly brutal crime. The mutilated and ravished body of a young schoolgirl named Corinne Gallagher had been found crammed into a trunk in a Detroit apartment, where a man named Merton Goodrich had lived.
>
> Goodrich, who had a criminal record and had once been committed to a mental institution after a sex offense, was arrested under a different name in New York for child-molesting, identified by his fingerprints, and returned to Michigan to stand trial.
>
> Public Act 88 of 1935, hurriedly tailored to his case in detail, provided for procedures under the Code of Criminal Procedures whereby persons appearing to be sex degenerates could, after serving prison sentences for specified sex crimes, be committed indefinitely to mental institutions. This law was hurriedly passed to take immediate effect on May 27, 1935. [Interim Report of the Special Committee on Mental Health Legislation for Criminal Cases, 5 1967 House Journal 115, 118.]

The statute amended the Code of Criminal Procedure and provided that, when a defendant was convicted of certain sex-related offenses, if the defendant "shall, though not insane,[11] feeble-minded or epileptic, appear to be psychopathic, or a sex degenerate,

---

[10] While some sources list 1937 PA 196 as the original Goodrich Act, e.g., *Sex Offender Statutes*, 92 Nw U L Rev at 1351 n 171, it is apparent that the genesis of the legislation was 1935 PA 88, see, e.g., Morris, *Mental Illness and Criminal Commitment in Michigan*, 5 U Mich J L Reform 1, 39 (1971).

[11] "The sexual psychopath statutes . . . regarded sexual psychopaths as neither normal nor legally insane . . . ." *Sex Offender Statutes*, 92 Nw U L Rev at 1352. See also Comment, *Validity of Sex Offender Acts*, 37 Mich L Rev 613, 617 (1939) ("Today psychiatrists recognize a large intermediate group of psychopathic personalities, persons neither

or a sex pervert, with tendencies dangerous to public safety, the trial court before pronouncing sentence shall institute and conduct a thorough examination and investigation of such person . . . ." 1935 PA 88, § 1a. The defendant was "entitled to a jury hearing" for this investigation, but if the requisite mental condition was proved, the court was to direct that after the defendant had served his jail or prison term, the defendant was to "be removed and committed to such suitable state hospital or state institution as the court may designate in such commitment, to remain in such state hospital or state institution until said court shall adjudge that such person has ceased to be a menace to the public safety because of said mental condition." *Id*.

The 1935 statute "was the genesis of [a] further amendment and addition in 1937 . . . ." *People v Frontczak*, 286 Mich 51, 55; 281 NW 534 (1938). The new law, 1937 PA 196, "amended . . . the former act so as to provide . . . for commitment to a suitable State hospital, with suspension of sentence or holding the same in abeyance," *Frontczak*, 286 Mich at 55, with annual reviews of the defendant's condition (subject to a jury trial) until such time as the trial court concluded that the defendant "ha[d] ceased to be a menace to the public safety because of such tendencies and mental condition," 1937 PA 196, § 1a, at which point the defendant would receive credit against his sentence for the time spent in treatment. The 1937 law also added a process by which defendants who were already serving time in prison could be evaluated. When an existing prisoner

strictly sane nor insane by conventional standards. . . . Particularly, most of those convicted of sex crimes must be regarded not as insane, but as psychopathic personalities."); Anno, 24 ALR2d at 351, § 1 (stating that sexual psychopath laws "recognize that the sexual psychopath is neither normal nor legally insane . . . .").

"appear[ed] to be a sex degenerate or a sex pervert, or appear[ed] to be suffering from a mental disorder characterized by marked sexual deviation, with tendencies dangerous to public safety, the commissioner of pardons and paroles" was authorized to "file his petition [making such allegations] in the circuit court of the county where such person may be confined," with the defendant to receive a local jury trial as to his mental state. 1937 PA 196, § 1b.

We held in *Frontczak* that 1937 PA 196, § 1b, was unconstitutional. The defendant in *Frontczak* had been convicted a few months before 1937 PA 196 took effect and was serving time at the prison in Ionia. A petition was filed against him and tried in Ionia circuit court, and he was committed under the act. We explained:

> This enactment is more than an inquest relative to the mental condition of a prisoner because the company in which it is found is a part of criminal procedure following conviction of a criminal offense and after sentence and during confinement and, in the instance at bar, removed from the jurisdiction of the trial court and domicile of the prisoner and vested in another court, at a point removed from the prisoner's former domicile, and where he is to be tried by a jury in a vicinage where the criminal law has him in confinement and where he committed no crime. . . .

> Section 1b . . . is void, as subjecting an accused to two trials and convictions in different courts for a single statutory crime, with valid sentence interrupted by supplementary proceeding in another court, with confinement in a non-penal institution and with possible resumption of imprisonment under the original sentence. If not for a single offense, then one trial is for a penalized overt act and the other for having a mental disorder, characterized by marked "sexual deviation." For an overt act offense the accused has a right to trial by jury of the vicinage, while under this act, for no statutory offense, he is to be tried by a jury of another vicinage, possibly far removed from his former domicile and friends and, if penniless and friendless, and the procedure is not under the criminal code he cannot obtain counsel or have witnesses at public expense. If the procedure is not under the criminal code, then the enactment is no amendment or addition to that code and a mere estray and a nullity. [*Frontczak*, 286 Mich at 57-58.]

14

We later held in *In re Boulanger*, 295 Mich 152; 294 NW 130 (1940), that 1935 PA 88, § 1a, as amended by 1937 PA 196, § 1a, was similarly unconstitutional.

## 2. THE SECOND GOODRICH ACT

In response to *Frontczak*, the Legislature adopted 1939 PA 165,[12] and repealed the first Goodrich Act in 1939 PA 199.[13] The new law was pointedly not made part of the Code of Criminal Procedure,[14] but was instead an independent statutory scheme. It defined a "criminal sexual psychopathic person" as "[a]ny person who is suffering from a mental disorder and is not insane or feeble-minded, which mental disorder has existed for a period of not less than 1 year and is coupled with criminal propensities to the commission of sex offenses." 1939 PA 165, § 1. The procedure was no longer confined to enumerated sex crimes, but instead was available in any criminal case. The prosecuting attorney was to allege that the defendant was a "criminal sexual psychopathic

---

[12] See Interim Report, 5 1967 House Journal at 118 ("The present Goodrich Act, Public Act 165 of 1939, was perhaps less of a reaction to a shocking crime than a reaction to an adverse Supreme Court decision.").

[13] There was actually a second piece of legislation in the first Goodrich Act: 1935 PA 87, which created a process by which proceedings before a justice of the peace for sex crimes could be referred to the circuit court for the same procedures as in 1935 PA 88. Our *Frontczak* decision and 1939 PA 199 left it "render[ed] ineffective," OAG, 1941-1942, No. 23908, p 623, at 623 (June 11, 1942), although it was not until 1990 PA 219 that the Legislature repealed it as a house-cleaning measure on the advice of the Michigan Law Revision Commission, see House Legislative Analysis, HB 4754 (January 7, 1991); Michigan Law Revision Commission, 10th Annual Report (1975), pp 123-124.

[14] See Report of the Senate Interim Study Committee Pertaining to Criminal Sexual Deviates, 2 1958 Senate Journal 1019, 1021 ("Following the Frontczak decision, . . . the Legislature at its next session in 1939 enacted P.A. No. 165, not as a curative amendment but as an independent Act . . . .").

person." If the court determined that the defendant was a "criminal sexual psychopathic person," it was to "commit such person to the state hospital commission to be confined in an appropriate state institution under the jurisdiction of either the state hospital commission or the department of corrections until such person shall have fully and permanently recovered from such psychopathy," as determined by petitioning the circuit court and after a jury trial. 1939 PA 165, §§ 5 and 7; see *In re Rowan*, 305 Mich 231; 9 NW2d 528 (1943) (holding that an individual committed under the statute was entitled to a jury trial). A person found to be a criminal sexual psychopathic person could not later "be tried upon the offense with which he originally stood charged in the committing court at the time of the filing of the original petition." 1939 PA 165, § 8.

The constitutionality of the second Goodrich Act was upheld in *People v Chapman*, 301 Mich 584; 4 NW2d 18 (1942). We distinguished the 1939 legislation from that which preceded it by noting that the earlier legislation was

> placed in the criminal-code chapter relating to judgments and sentences in criminal cases. The present statute is not contained in either the code of criminal procedure or the penal code. It makes sex deviators subject to restraint because of their acts and condition, and not because of conviction and sentence for a criminal offense. It does not extend or impose an added or different sentence under the guise of hospitalization. The procedure under this statute resembles a statutory inquest for the commitment of an insane person accused of a felony. Proceedings under the present statute are not criminal in nature and, therefore, are not circumscribed by the constitutional and statutory limitations surrounding a person accused of, or tried for, a crime. [*Id*. at 602-603 (citation omitted).]

See also *People v Piasecki*, 333 Mich 122, 142; 52 NW2d 626 (1952) (noting that proceedings to indefinitely commit a criminal sexual psychopathic person were "wholly separate and apart from proceedings under the criminal law of the State").

16

## 3. SEXUAL DELINQUENCY

The actual sexual-delinquency scheme we interpret in this case was, in turn, adopted because of dissatisfaction with the second Goodrich Act. In 1949, then-Governor G. Mennen Williams appointed a committee, which named itself the "Governor's Study Commission on the Deviated Criminal Sex Offender." It "felt that the so-called 'Goodrich Act' was merely stop-gap legislation passed hastily at the time of some sex murders in the 1930s," and recommended a variety of amendments to the scheme, only some of which were adopted as 1950 (Ex Sess) PA 25. See Report of the Governor's Study Commission on the Deviated Criminal Sex Offender (1951), p 120. Yet the Commission "d[id] not consider even [that] amended Act to be the ultimate legislation . . . ." *Id.* at 120. The Commission faulted the Goodrich Act for being "dependent upon a finding of a specific type of mental disorder which must be defined in the legislation," which was "particularly vexatious because it represent[ed] an attempt to write into law a medically determined condition." *Id.* at 129. Moreover, the Commission thought it was a problem under the Goodrich Act "that some designated person—the prosecuting attorney, attorney general, defense counsel, or other person with knowledge of the facts—must prepare a special petition in order to start the commitment proceedings." *Id.* at 130. The Commission preferred that "[t]he option of indefinite commitment with treatment present[] itself automatically upon conviction, so that intermediate determinations by third parties are avoided." *Id.* at 131.

The Commission "ma[de] a careful study of the statutory treatment of the sex deviation problem by other States." *Id.* at 121. It ultimately "recommend[ed] the general theory recently developed by New York as the basic reform." *Id.* at 124. The

centerpiece of this reform was making "[c]ertain more serious sex offenses . . . punishable by either a sentence of imprisonment for a fixed minimum and maximum number of years or an indeterminate sentence of imprisonment for one day to life." *Id*. The repeated references to "one day to life" in the report make clear that other sentences (such as "two days to life" or some such) were not intended. See, e.g., *id*. at 134 ("[T]he Committee recommends that the alternative indeterminate sentence of one day to life be applied to several sex offenses which were not included within the program of the State of New York."); *id*. at 136 ("The Committee re-emphasizes that the alternative indeterminate sentence of one day to life is not designed as a method of punishment. It is merely a technical method of obtaining indefinite commitments so that the convicted sex offender may be segregated as long as necessary to protect the public and to provide for rehabilitation for his own protection and well-being."). See also Thurber, *A Twentieth Century Program for the Sex Offender Problem*, 15 U Det L J 1, 8 (1951) ("Under the Commission plan an indeterminate sentence of one day to life (the wording of the sentence as imposed would be 'which shall have a minimum of one day and a maximum of life') would be added to the options . . . ."). The Commission also "believe[d] that the adoption of this program for the disposition of the convicted sex offender, in conjunction with other recommendations of the Committee, would eliminate the need for Michigan's 'Goodrich Act.' " Governor's Commission Report, p 141.

In the end, the Legislature adopted a revised version of the program recommended by the Governor's Study Commission, which became our current sexual-delinquency

regime.  Certain recommendations were rejected.[15]  For example, the "1 day to life" option is available only for "sexually delinquent persons" as defined in MCL 750.10a, leaving in place some of the definitional issues that came with characterizing a defendant as a "criminal sexual psychopathic person."  The charging procedure in MCL 767.61a "provide[s] for a double charge for an offense committed by a sexually delinquent person," requiring "[t]he indictment [to] charge (1) the offense [and] (2) that at the time the offender was a sexually delinquent person," Interim Report, 2 1958 Senate Journal at 1023, leaving in place the need for a special allegation to begin commitment proceedings. Moreover, notwithstanding the Commission's recommendation, the Legislature did not repeal the Goodrich Act, "because the statute was regarded as a useful prosecution tool for forcing the confinement and treatment of certain varieties of sex offenders."  Interim Report, 5 1967 House Journal at 119.  It is apparent, in other words, that the Commission's recommendations do not speak for the Legislature's ultimate legislative action.

That said, it is equally clear that the Legislature *did* take some action consistent with the Commission's recommendations.  First and foremost, the Michigan Penal Code was amended to include the "1 day to life" sentencing option for several crimes, including indecent exposure:

> Any person who shall knowingly make any open or indecent exposure of his or her person or of the person of another shall be guilty of a misdemeanor, punishable by imprisonment in the county jail for not more than 1 year, or by a fine of not more than $500.00, or if such person was at

---

[15] One legislative report said "[i]t emerged from the legislative hopper, amended so as to be unworkable . . . ."  Interim Report, 2 1958 Senate Journal at 1023.

the time of the said offense a sexually delinquent person, may be punishable by imprisonment in the state prison for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life . . . . [1952 PA 73.]

Moreover, the statute governing the Department of Corrections was amended to provide for how to handle individuals given this alternate sentence:

> Sec. 33a. As soon as possible after a commitment and at intervals not to exceed 6 months thereafter during the term of each prisoner sentenced to an indeterminate term of a minimum of 1 day and a maximum of life, the parole board shall cause to be brought before it, with respect to such prisoner, a copy of the pre-sentence probation report . . . to assist the board in its determination of the granting or refusal of parole at that time . . . .

> Sec. 36a. The following shall apply to those persons paroled from a sentence of from 1 day to life . . . .

> Sec. 40a. Whenever in the opinion of the parole board, upon consideration of the record and condition of a prisoner sentenced to an indeterminate term of a minimum of 1 day and a maximum of life, . . . it shall appear that such prisoner is no longer a sexually delinquent person, the board may enter an order of final discharge . . . .

> Sec. 40b. Upon the failure of the parole board to grant to any prisoner, not on parole, sentenced to an indeterminate term of a minimum of 1 day and a maximum of life, an unconditional discharge, but in no case sooner than 3 calendar years after commitment, nor more often than every 5 calendar years thereafter, said prisoner, by himself or through counsel, shall have the right to petition to the sentencing court for a hearing or trial. . . . If the court or the jury finds by a preponderance of the evidence that such prisoner is no longer a sexually delinquent person, the court shall order his unconditional discharge; otherwise, such prisoner shall forthwith be returned to the custody of the state department of corrections. [1952 PA 72.]

Not long after this scheme was adopted, the Legislature began chipping away at it. The provisions regarding how the Department of Corrections was to specially process individuals given "1 day to life" sentences were not retained when the Corrections Code

20

was adopted. See 1953 PA 232. The Goodrich Act itself was repealed. 1968 PA 143. The Legislature also withdrew the ability to sentence defendants to "1 day to life" for several crimes. See 1974 PA 266. Thus, "sexual delinquency is now limited to five specific criminal provisions, three of which arise from the same criminal conduct," *Helzer*, 404 Mich at 422—the five offenses being (1) sodomy, MCL 750.158, (2) indecent exposure, and (3) gross indecency between (a) two males, MCL 750.338, (b) two females, MCL 750.338a, or (c) between a male and a female, MCL 750.338b.

IV. ANALYSIS

A. SEXUAL-DELINQUENCY SENTENCING BEFORE THE GUIDELINES

As noted, the threshold question we must address is what the proper interpretation of the sexual-delinquency scheme was before the sentencing guidelines were adopted in 1998. This, in turn, has three components: first, whether the "1 day to life" sentence was optional or mandatory for defendants who qualified for it; second, whether the "1 day to life" sentence was a range within which a judge could sentence and thus could be modified, or whether it was nonmodifiable; and third, what effect the ban in MCL 769.9(2) on so-called "life tails" has on the "1 day to life" scheme.

1. OPTIONAL VS. MANDATORY

As has been noted, the basic functioning of the sexual-delinquency scheme is that certain sex offenses are identified as being eligible for different treatment if the defendant is accused and convicted of having been a "sexually delinquent person" at the time of the offense. The procedure that is common to all these offenses is laid out in MCL 767.61a, which characterizes the "1 day to life" sentence as "an alternate sentence." The question

21

we confront is whether this is a *mandatory* alternative or an *optional* alternative. We conclude that the best reading is to construe it as an *optional* alternative.

The adjective "alternate" is defined as "[s]erving or used in place of another; substitute[.]" *American Heritage Dictionary of the English Language* (5th ed), def 3. But the dictionary offers a cross-reference to the usage note for "alternative," which notes that "[a]s an adjective, *alternative* can mean 'allowing or requiring a choice between two or more things,' " but it "may also refer to a variant or substitute in cases where no choice is involved . . . ." Thus, when road construction is going to make an arterial highway unavailable, authorities advise motorists to "seek alternate routes," because the usual route can no longer be chosen. This usage coexists with the notion of "alternate" as optional, such as deciding which of two alternate routes will get the motorist to their destination faster. Which meaning is intended here?

We believe the better reading of the scheme construes the "alternate sentence" as optional. Consider that, in 1952 PA 73, the Legislature provided that indecent exposure was "punishable by imprisonment in the county jail for not more than 1 year" and, if committed by a sexually delinquent person, "may be punishable by imprisonment in the state prison for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life[.]" The word "punishable" is defined as "liable to punishment; capable of being punished." *Oxford English Dictionary* (2d ed).[16] The word expresses only the *potential* for punishment, not its necessity, meaning that either up to a

---

[16] See also *Black's Law Dictionary* (4th ed), which was published in 1951 and defined "punishable" as "[d]eserving of or capable or liable to punishment; capable of being punished by law or right."

year in jail or a "1 day to life" sentence were *possibilities*. This conclusion is further strengthened by the fact that the statute said that, when dealing with a sexually delinquent person, the offense "may be" punishable by a "1 day to life" sentence. It is well established that the use of the word "may" is ordinarily permissive. See *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 612; 321 NW2d 668 (1982) ("[C]ourts should give the ordinary and accepted meaning to . . . the permissive word 'may' . . . ."); see also *Allen v Carpenter*, 15 Mich 25, 43-44 (1866) ("The provision . . . is permissive in its form, and only declares that all such tenancies *may* be thus terminated[.]"); *Largy v Holland*, Blume Unrep Op 129, 132 (Mich, 1842) ("The language . . . of the 10th [statutory section is] *permissive*, 'The award *may* be returned . . . .'"). Moreover, the Legislature is certainly capable of adopting nondiscretionary sentences. See, e.g., MCL 750.227b(1) ("A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony . . . shall be punished by imprisonment for 2 years."). Even if, as a matter of general English usage, "alternate" can in some contexts refer to a mandatory alternative, we do not conclude that the Legislature was using it in this mandatory fashion here when it deliberately chose not to use the sort of mandatory language it ordinarily uses when it wants to preclude other sentencing options.

Construing the "alternate sentence" for sexually delinquent persons as entirely optional is also more consistent with the broader law of sentencing in Michigan when the sexual-delinquency scheme was adopted. At that time, "appellate review of sentences . . . included [only] the procedural consideration of how the defendant was sentenced as well as a consideration of whether the substance of the sentence was statutorily or constitutionally permissible." *People v Coles*, 417 Mich 523, 532; 339 NW2d 440

23

(1983). See also *Lockridge*, 498 Mich at 415 n 8 (MARKMAN, J., dissenting) ("Michigan initially had a purely indeterminate sentencing scheme, in which the judge possessed unfettered judgment to sentence a defendant anywhere between no jail time and imprisonment in the amount of the statutory maximum."). It was not until Administrative Order No. 1983-3, 417 Mich cxxi (1983), that we went so far as to "invite[], but not require[]," trial judges to use sentencing guidelines. And when we did make them mandatory, Administrative Order No. 1984-1, 418 Mich lxxx (1984); Administrative Order No. 1985-2, 420 Mich lxii (1985), indecent exposure by a sexually delinquent person was not included in the scheme, Michigan Sentencing Guidelines (1988), p 13. In other words, before the statutory sentencing guidelines' enactment, a judge faced with an adjudicated sexual delinquent guilty of indecent exposure could choose any legally available sentencing option the judge deemed appropriate.

Construing the "1 day to life" option as an alternative, which the trial court was free to consider alongside an ordinary criminal sentence of up to one year in jail, is also supported by the history of the sexual-delinquency scheme. As the Governor's Study Commission said:

> It is also important to state the possible alternatives which will be available to the court upon conviction of a sex offender. The alternative one day to life sentence would be but one additional method of disposition in a particular case. At present, the court may sentence the convicted sex offender to a prison term with a fixed minimum and maximum number of years; the court may suspend sentence; it may impose a fine; or it may place the offender on probation. These present alternatives would continue. In addition, the court would have the power under the new sentence to protect the community adequately and to provide treatment and rehabilitation for the offender. [Governor's Commission Report, p 137.]

See also *Twentieth Century Program*, 15 U Det L J at 8 (stating that the indeterminate sentence option "would be added to the options already available to courts of record when the latter are confronted with a convicted or confessed sex offender" even while "[a]ll present options remain unimpaired"); Bennett, *Proposed Additional Means of Dealing with Sex Offenders*, 30 Mich St B J 28, 32 (1951) (stating that the scheme would provide for the "[a]ddition of an alternative sentence of one day to life . . . *in the discretion of the court*").

In light of all of these considerations—the text of the statutory scheme, the Legislature's usual pattern in clearly identifying mandatory sentences, the relation this scheme would have had to the overarching law of sentencing at the time the scheme was adopted, and the history of the scheme—we conclude that *Kelly* correctly construed the "1 day to life" alternate sentence as an *option* a sentencing judge could draw upon, alongside and not to the exclusion of other available options.

## 2. MODIFIABLE VS. NONMODIFIABLE

Having concluded that *Kelly* correctly construed "1 day to life" as an option, we must also determine what the parameters of that option were. The "1 day to life" option was said in MCL 767.61a to be punishable by an indeterminate term, "the minimum of which is 1 day and the maximum of which is life . . . ." But did this mean that the minimum *the judge could choose from* was 1 day, and the maximum *the judge could choose from* was life? Or did it mean that, if the judge chose to sentence under the "1 day to life" scheme, the sentence could be nothing other than precisely "1 day to life"?

25

We believe that the better reading of the scheme is that "1 day to life" was not modifiable. Consider that 1952 PA 73 said that, while indecent exposure by a sexually delinquent person *may* be punishable by a special indeterminate sentence, it also said that if such a sentence was imposed, "the minimum of [the term] shall be 1 day and the maximum of [the term] shall be life." The use of the word "shall" suggests that a trial court had no discretion to further modify the terms of the sentence, because if it chose to avail itself of the special indeterminate sentence, it had to sentence according to the special sentence's terms. See *Smith v Sch Dist No 6*, 241 Mich 366, 369; 217 NW 15 (1928) ("By the use of the word 'may' in the first section, the Legislature authorized and permitted the board of education to come under the provisions of the act if it so desired. By the use of the word 'shall' in the other portions of the act it was the legislative intent that if the board of education adopted the act, then such other provisions became mandatory and the board of education became bound to follow and enforce them. In other words, districts 'may' come under the provisions of the act. If they do its provisions 'shall' be followed."). Moreover, MCL 767.61a characterized "1 day to life" as an "alternate" sentence, which indicates that it ought to function in some distinct way. Consider that MCL 769.12(1)(c) allows a fourth-offense habitual offender who has committed a less-than-5-year felony to be sentenced to a maximum of up to 15 years; would we characterize the up-to-15-year sentence as an "alternate sentence" to the ordinary sentence? Certainly not, because it works no differently, but is simply more of the same.

Again, the history of the enactment of the sexual-delinquency scheme further supports this conclusion. While 1952 PA 72 has since been repealed, it was adopted

26

contemporaneously with the sexual-delinquency scheme, and it directed the DOC on how to process "persons paroled from a sentence of from 1 day to life[.]" 1952 PA 72, § 36a. There are no instructions for how to process persons paroled from a sentence of, for example, *2* days to life. This Court's statements in *Helzer* further confirm the nonmodifiable nature of the "1 day to life" option. There, the Court of Appeals had "found sexual delinquency to be . . . simply a penalty enhancement provision related to the principal gross indecency charge," an interpretation we rejected because the scheme "reflects legislative intent to construe sexual delinquency as a separate, alternate form of sentencing." *Helzer*, 404 Mich at 419.

Construing "1 day to life" as being nonmodifiable is also consistent with the history of the sexual-delinquency scheme, which was clearly intended to be therapeutic and open-ended. It is apparent that the sexual-delinquency scheme was adopted as a further refinement of the preexisting "Goodrich Act," and it viewed sexual delinquency as a form of mental illness for which an offender would receive treatment. See, e.g., *Twentieth Century Program*, 15 U Det L J at 8 ("The heart of the Commission program is the introduction of a true indeterminate sentence in the disposition of offenders convicted of sex crimes" which was "*already approximated in the indeterminate commitments had under Michigan's present sex-psychop[a]th law.*") (emphasis added). The purpose of the scheme was to create a *different* sentencing option, one in which the judge *gave up* control over the amount of time the defendant served to experts who would assess when the defendant was well enough to rejoin society.

27

Once again, in light of all of these considerations—the text of the scheme, its history as an evolution of the older Goodrich Act, and its apparent purpose—we conclude that *Kelly* correctly interpreted the "1 day to life" sentencing option as nonmodifiable.

### 3. "1 DAY TO LIFE" AND MCL 769.9(2)

Finally, we agree with *Kelly* that the "1 day to life" sentencing scheme is an exception to the indeterminate sentencing statute's ban on so-called "life tails," MCL 769.9(2). First, textually, MCL 769.9(2) applies only to "cases where the maximum sentence in the discretion of the court may be imprisonment for life or any number or term of years . . . ." The phrasing "life or any term of years" is used verbatim in a variety of statutes. See, e.g., MCL 750.72(3) (stating that first-degree arson is a felony "punishable by imprisonment for life or any term of years"); MCL 750.85(1) (same for torture); MCL 750.136b(2) (same for first-degree child abuse). When MCL 750.335a was adopted, it spoke of "imprisonment in the state prison for an indeterminate term, the minimum of which shall be 1 day and the maximum of which shall be life," 1952 PA 73, and MCL 767.61a speaks of "an indeterminate term, the minimum of which is 1 day and the maximum of which is life . . . ." On its own, this difference in wording may be enough to remove sexual-delinquency cases from MCL 769.9(2). Moreover, we agree with *Kelly* that because MCL 769.9(2) is a general indeterminate sentencing statute, while the sexual-delinquency scheme is a specific, integrated scheme, the more specific statute controls. "When a general intention is expressed, and also a particular intention, which is incompatible with the general one, the particular intention shall be considered an

28

exception to the general one." *Attorney General ex rel Owen v Joyce*, 233 Mich 619, 624; 207 NW 863 (1926) (quotation marks and citation omitted).

In short, we construe the "1 day to life" sentence that the Legislature adopted in 1952 as being an alternative sentencing option that existed *alongside* other options, such as a life sentence or a term of years. Much as "[t]he sentence concepts 'life' and 'any term of years' are mutually exclusive and a sentencing judge may (in the appropriate case) opt for either but not both," *People v Johnson*, 421 Mich 494, 498; 364 NW2d 654 (1984), so "1 day to life" was a mutually exclusive concept that a sentencing judge was free to opt for to the exclusion of a life- or term-of-years sentence.

## B. RAMIFICATIONS OF AFFIRMING *KELLY*

There are a few consequences for other areas of our caselaw that flow from our conclusion that *Kelly* correctly construed "1 day to life" as a nonmandatory option that a trial court could draw upon should it choose to exercise its discretion to do so. First, in *People v Butler*, 465 Mich 940, 941 (2001), we said that "there is no alternative to the mandatory indeterminate sentence of one day to life in prison where the trial court chooses to incarcerate a person convicted under MCL 750.335a and MCL 750.10a." This was incorrect. As we have held, "1 day to life" was not a mandatory sentence even when the trial court chose to incarcerate the defendant.[17] Nor has any aspect of the legislative sentencing guidelines purported to make "1 day to life" mandatory.

_____

[17] In similar fashion, in *People v Murphy*, 203 Mich App 738, 745; 513 NW2d 451 (1994), the Court of Appeals said that the sexually delinquent person scheme's "alternate sentencing provisions . . . instructed the judge that the Legislature considered one day to life to be the correct sentence for the principal offense." Insofar as this suggested that "1 day to life" was the *mandatory* sentence the trial court was obliged to impose, it was

Second, we must revisit our decision in *Buehler III*, which we now recognize was based on a flawed initial premise about the sexual-delinquency scheme. In that case, the defendant was convicted of indecent exposure by a sexually delinquent person and had a minimum sentencing range of 42 to 70 months' imprisonment under the guidelines. The trial court, however, departed from that recommendation and imposed a sentence of 3 years' probation. The prosecutor initially moved for resentencing, arguing that the trial court was obliged to sentence the defendant to "1 day to life." The trial court denied the motion. On appeal, the prosecutor shifted to arguing that the trial court had not articulated adequate reasons to depart from the guidelines. The Court of Appeals initially reasoned much as we have in this opinion. See *People v Buehler* (*Buehler I*), 268 Mich App 475; 710 NW2d 55 (2005). It concluded that, "regardless of whether the term of any indeterminate prison sentence imposed by a trial court is controlled by the statutory sentencing guidelines or the more exacting language of MCL 750.335a, the plain, unambiguous language of MCL 750.335a indicates that such a sentence is merely an alternative to the determinate jail sentence or fine generally available for a conviction under MCL 750.335a." *Id*. at 480. The panel went on to conclude that probation is an additional punishment available to the trial court under the language in MCL 767.61a giving the trial court the ability to "impose any punishment provided by law," and affirmed the trial court's decision. *Id*. at 482-483.

On the prosecutor's appeal to this Court, we vacated the decision of the Court of Appeals and remanded for consideration of "whether any term of imprisonment that may

wrong.

30

be imposed by the circuit court is controlled by the legislative sentencing guidelines or by the indeterminate sentence prescribed by MCL 750.335a," as well as whether the trial court offered adequate justification to depart from the guidelines. *People v Buehler*, 474 Mich 1081 (2006). On remand, the Court of Appeals concluded that the trial court had not articulated adequate reasons to depart from the guidelines. *Buehler II*, 271 Mich App at 656. As to whether MCL 750.335a or the statutory guidelines controlled, the Court of Appeals felt that MCL 750.335a "plainly require[d] that any term of imprisonment imposed for a conviction of indecent exposure as a sexually delinquent person be for a period of one day to life." *Id*. at 657. Because the guidelines "require[d] imposition of a sentence consistent with a minimum guideline range that will vary with the circumstances surrounding each particular offense and offender, and MCL 750.335a expressly require[d] a definitive sentence of one day to life, there c[ould] be no construction that wholly avoid[ed] conflict between these two statutes." *Id*. at 658. The panel concluded that the guidelines, as the more recently enacted legislation, should control. However, the Court of Appeals reiterated that probation was a lawful sentence that the trial court could impose under MCL 767.61a and reaffirmed the trial court. The panel noted that it expressed no opinion on the effect of 2005 PA 300 on the case because it was adopted after the defendant's criminal conduct. *Buehler II*, 271 Mich App at 654 n 1, 659 n 4.

On appeal again to this Court, we reversed the Court of Appeals decision. *Buehler III*, 477 Mich at 28. We observed that indecent exposure by a sexually delinquent person was a listed felony in the guidelines, and we concluded that the trial court was obliged to impose a sentence within the appropriate guidelines range in the absence of a substantial and compelling reason to depart. We "agree[d] with the Court of Appeals that the trial

31

court in th[at] case failed to state substantial and compelling reasons for a departure," *Buehler III*, 477 Mich at 24, meaning that the "defendant's sentence [was] invalid under the sentencing guidelines," *id*., and we faulted the Court of Appeals for "not end[ing] its analysis at that point," *id*. at 25.

> Both panels held that courts may avoid the guidelines for any probationable felony. The probation statute and the sentencing guidelines must be construed together because "statutes that relate to the same subject or that share a common purpose are *in par*[*i*] *materia* and must be read together as one." When there is a conflict between statutes that are read *in par*[*i*] *materia*, the more recent and more specific statute controls over the older and more general statute. Significantly, the panel in *Buehler II* found that MCL 750.335a and the sentencing guidelines were *in par*[*i*] *materia* and that the more recently enacted guidelines control. Unfortunately, neither panel applied the same analysis to the probation statute and the sentencing guidelines. The sentencing guidelines were enacted after the probation statute, and they are more specific in that they provide a detailed and mandatory procedure for sentencing involving all enumerated crimes. Therefore, the sentencing guidelines control for a crime that could be punished under the guidelines or with probation. [*Id*. at 26-27.]

Because probation was a departure from the guidelines range and the trial court had not articulated substantial and compelling reasons to depart from the range, we reversed the Court of Appeals and remanded to the trial court for resentencing. *Id*. at 28. We also stated that we had no opinion of the effect of 2005 PA 300 on the case. *Id*. at 24 n 18.

Our close analysis of the sexual-delinquency scheme in this case reveals that *Buehler* did not appreciate the nature of the "1 day to life" sentence and the tension between it and the sentencing guidelines. For example, in our remand order to the Court of Appeals in *Buehler*, we directed the Court to compare the guidelines against "the indeterminate sentence *prescribed by* MCL 750.335a." *Buehler*, 474 Mich at 1081. But our conclusion here that *Kelly* was rightly decided indicates that MCL 750.335a did not

32

*prescribe* anything; instead, it only made an *option* available. *Buehler* also presumed that the trial court's deviation from the sentencing guidelines should have been the end of that case's analysis. But at least until the adoption of the sentencing guidelines, no sentence on the Class A sentencing grid would even have been *legal* for a judge to impose on a sexually delinquent person who was found guilty of indecent exposure. *Buehler* did not consider whether the adoption of the legislative sentencing guidelines could make legal a sentence that would not otherwise have been legal before the guidelines were adopted.

Of course, in some respects *Buehler III*'s holding is now irrelevant, because trial courts need not express substantial and compelling reasons to depart downward after *Lockridge*. But here, the Court of Appeals relied on *Buehler III*'s treatment of the sexual-delinquency scheme alongside the sentencing guidelines to reach its conclusion. We no longer regard *Buehler III* as a binding statement of the proper interpretation of these statutes.

## V. APPLICATION

Having concluded that the sexual-delinquency scheme created only an *optional* "1 day to life" sentence that trial courts were free to select alongside the other sentencing remedies available to them, we now turn to the case at hand. The panel here simply relied on *Campbell*, which it was bound to do, MCR 7.215(J)(1), so we turn our attention to *Campbell*.

In *Campbell*, the defendant was convicted of six counts of indecent exposure by a sexually delinquent person. The trial court sentenced him to 35 to 82 years in prison. *Campbell*, 316 Mich App at 281. On appeal, the defendant argued "that the trial court

33

did not have the discretion to determine a minimum and maximum sentence under the sentencing guidelines" because, in light of *Lockridge*'s holding "that the sentencing guidelines are advisory, . . . trial courts are required to sentence a person convicted of indecent exposure as a sexually delinquent person to serve one day to life in prison." *Campbell*, 316 Mich App at 297. The panel characterized the issue as "whether MCL 750.335a or the statutory sentencing guidelines control[led] Campbell's sentence . . . ." *Id*. at 298. It noted that the Court of Appeals and this Court had stated in *Buehler II* and *Buehler III* that they had no opinion on the effect of 2005 PA 300. *Id*. The Court then said:

> Campbell argues that the change in statutory language [due to 2005 PA 300] from "may be punishable" to "is punishable" indicates that the Legislature intended that the indeterminate sentence of one day to life be a mandatory sentence, notwithstanding the sentencing guidelines.
>
> We agree that the conflict between the statutory language provided under MCL 750.335a(2)(c) and the sentencing guidelines, MCL 769.34, must now be resolved in favor of applying MCL 750.335a(2)(c). Our Supreme Court has determined that the sentencing guidelines were unconstitutional to the extent that the guidelines required trial courts to determine a defendant's minimum sentence on the basis of facts "beyond those admitted by the defendant or found by the jury beyond a reasonable doubt . . . ." *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015). Although the Supreme Court determined that the guidelines should still be scored by trial courts, it nevertheless held that trial courts are no longer required to sentence a defendant to a minimum sentence within the range provided by the guidelines—that is, the guidelines are now merely advisory. *Id*. at 365. By contrast, the sentence provided under MCL 750.335a(2)(c) is stated in mandatory terms. Consequently, after the decision in *Lockridge*, trial courts must sentence a defendant convicted of indecent exposure as a sexually delinquent person consistently with the requirements of MCL 750.335a(2)(c). [*Id*. at 299-300.]

34

In light of our conclusions in this case, *Campbell*'s reasoning cannot stand. First, MCL 750.335a(2)(c) is not "stated in mandatory terms." When adopted, it said that a sexually delinquent person who committed indecent exposure "*may be* punishable . . . for an indeterminate term, the minimum of which *shall be* 1 day and the maximum of which *shall be* life." 1952 PA 73. After 2005 PA 300, it now says that indecent exposure by a sexually delinquent person "*is* punishable . . . for an indeterminate term, the minimum of which *is* 1 day and the maximum of which *is* life." In our view, this change in wording has no effect on the meaning of the statute and is merely stylistic. While "a change in the language of a prior statute presumably connotes a change in meaning," "[t]his presumption does not apply to stylistic or nonsubstantive changes." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 256. Cf. *id*. at 114 ("[T]here has been a movement in recent years to rewrite the federal rules—appellate, criminal, civil, evidence—to remove all the *shall*s and otherwise restyle them. . . . Each *shall* became *must*, *is*, or *may*.") After all, MCL 750.335a(2)(c) still says only that the offense is *punishable* by a "1 day to life" sentence, and "punishable" expresses only the possibility of punishment, not its necessity. Moreover, MCL 767.61a has not been amended, meaning that it still characterizes "1 day to life" as an "alternate" sentence, not a mandatory sentence. Indeed, MCL 767.61a has always phrased the indeterminate sentence option in the same fashion as the postamendment version of MCL 750.335a: "the minimum of which *is* 1 day and the maximum of which *is* life." And MCL 767.61a lays out a procedure common to all five sexual-delinquency crimes, yet each of the other four still uses the former "may be punishable" and "shall be 1 day . . . shall be life" wording. The sexual delinquency alternative sentence is obviously

35

intended to work the same for all five offenses, so if it is optional for the others, it must still be optional for indecent exposure. All signs point to the 2005 amendment adding only the aggravated indecent-exposure offense and making no substantive changes to the "1 day to life" alternative sentence.[18]

Second, we do not believe that *Lockridge* has the significance ascribed to it by the Court of Appeals in *Campbell*. *Lockridge* concluded that the scoring process for the legislative sentencing guidelines violated the Sixth Amendment and, as a remedy for that constitutional violation, directed that henceforth the guidelines would be only advisory. Neither identifying that problem nor crafting that remedy illuminates whether the adoption of the sentencing guidelines and the classification of indecent exposure by a sexually delinquent person as a Class A felony could make legal a sentence that would not have been legal before the sentencing guidelines were adopted. Whether the sentencing guidelines are mandatory or merely advisory is neither here nor there; the question is what effect the legislative act of adopting the guidelines had on the sexual-delinquency scheme.

---

[18] While not dispositive, we also note that the pertinent legislative analysis does not even allude to an intent to make substantive changes to the meaning of the "1 day to life" option. See House Legislative Analysis, HB 4597 (August 16, 2006). While legislative analyses "are entitled to little judicial consideration," *In re Certified Question*, 468 Mich at 115 n 5 (2003), it is also true that the Legislature "does not, one might say, hide elephants in mouseholes," *Whitman v American Trucking Ass'ns*, 531 US 457, 468; 121 S Ct 903; 149 L Ed 2d 1 (2001). It seems unlikely that such a sea change in the law of indecent exposure, rendering its relationship with the rest of the sexual-delinquency scheme different from all the other sexually-delinquent-person crimes, would go without mention.

Third and finally, we no longer believe *Buehler III* fully understood the nature of the sexual-delinquency scheme. Its embrace of a vision of dueling mandates between MCL 750.335a and the sentencing guidelines misconstrued the nature of the "1 day to life" sentencing option provided by MCL 750.335a and MCL 767.61a. It appears that the Court of Appeals in the instant case relied on the series of *Buehler* decisions, in particular their caveat that the 2005 PA 300 amendment of MCL 750.335a may have been meaningful, in reaching its decision. By contrast, we have now concluded that the 2005 PA 300 amendment made no meaningful textual adjustment to the statute.

For all these reasons, *Campbell* must be set aside. However, given the significance of this decision, in which we are pointedly embracing *Kelly*,[19] overruling *Butler*, and disavowing *Buehler*, we believe that it is consonant with judicial modesty to remand this matter to the Court of Appeals for reconsideration in light of the revised state of the law. On remand, the Court of Appeals should resolve what effect the adoption of the legislative sentencing guidelines had on the operation of the sexual-delinquency scheme as we have construed it before the guidelines were adopted. We leave it to the parties and the Court of Appeals to decide what questions must be addressed to resolve

---

[19] We note that *Kelly* did not acknowledge the possibility of probation when it said that the trial court had the choice of an up-to-1-year sentence, a fine of up to $500, or a "1 day to life" sentence. This may have been because the judge imposed a life sentence in *Kelly*, meaning probation was apparently not a plausible consideration. Even while endorsing *Kelly* in certain respects, we express no opinion on the role of probation in sexual-delinquency sentencing.

37

that issue.[20]  This will best allow the strongest arguments to be developed as to what rule should apply to this defendant and future defendants.

## VI.  CONCLUSION

As noted, we believe that *Kelly* correctly construed the sexual-delinquency "1 day to life" scheme, as an *option* a trial court could use its discretion to consider imposing alongside the other statutory penalties available under the statute (at that time, up to 1 year in jail, which was expanded by 2005 PA 300 to be as much as 2 years in prison for aggravated indecent exposure).  We hold that the switch in 2005 PA 300 from "may be

---

[20] We note certain questions that may be helpful but are not necessarily dispositive in resolving on remand the effect of the legislative sentencing guidelines on the sexual-delinquency scheme.  For example, MCL 777.16 says that the sentencing guidelines apply "to felonies enumerated in [the Penal Code] as set forth in sections 16a to 16bb of this chapter."  Given our interpretation of the offense, is indecent exposure by a sexually delinquent person a distinct felony "enumerated" in the Penal Code?  (While we conclude that the change in language from 2005 PA 300 is immaterial, could its reorganization of MCL 750.335a constitute making this a distinct offense "enumerated" by the Penal Code if it was not before, or was this a mere stylistic change to improve readability?)  Does it matter if indecent exposure by a sexually delinquent person is "enumerated" in the Penal Code, given that the offense is "set forth" in MCL 777.16q as a listed felony?  (If it does not matter, what is the function of MCL 777.16, or is it surplusage?)  If many of the sentences provided for in the Class A sentencing grid, MCL 777.62, would not have been legal for this offense under the Penal Code (including the sentence defendant received), can such sentences be made legal because the offense is listed in the Code of Criminal Procedure as a Class A felony?  That is to say, where, as here, the legislative sentencing guidelines provide for a penalty that contradicts the penalty provided in the Penal Code for an offense, are the sentencing guidelines an amendment (or repeal) of inconsistent provisions of the Penal Code by implication such that the guidelines control?  If so, are there any constitutional problems with such an arrangement; for example, does it comport with Const 1963, art 4, § 25?  Are our decisions in *Frontczak* and *Boulanger*, dealing with the first Goodrich Act, relevant to answering these questions, or distinguishable?  Is the rule of lenity implicated?  See *People v Hall*, 499 Mich 446, 458 n 38; 884 NW2d 561 (2016).

punishable" to "is punishable," and "the minimum of which shall be 1 day" to "the minimum of which is 1 day," and "the maximum of which shall be life" to "the maximum of which is life," is merely stylistic. We conclude that *Lockridge*'s constitutional remedy is not pertinent to the outcome of this case. And we disavow *Buehler* as having been premised on a misconception of the law of sexual delinquency.

In light of these conclusions, we set aside *Campbell*, vacate the opinion of the Court of Appeals in the instant case, and remand the instant case to the Court of Appeals to consider, in light of these rulings, what effect the adoption of the legislative sentencing guidelines in 1998—and in particular, their classification of the instant offense as a Class A felony—had on a trial court's options in sentencing a defendant convicted of indecent exposure by a sexually delinquent person.

Elizabeth T. Clement
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder

39